## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

STEVEN A. WILLIAMS,

           Plaintiff,

  -against-

BARON PROPERTY GROUP LLC; LARGAVISTA
COMPANIES; 4560 BWY PARTNERS LLC;
MNS REAL ESTATE LLC; HARRY HIRSCH;
HHRMC; ANDREW BARROCAS; MALGORZATA
WARCHOL; SHARLINE ANDELIZ; MATTHEW
BARON; and MARCELLO PORCELLI,

           Defendants.

2026 MAY 11   PM 1:08   RECEIVED SDNY PRO SE OFFICE

Case No.: 1:26-CV-03204 (MKV)

### PROPOSED SECOND AMENDED COMPLAINT

### BENCH TRIAL ELECTED

### PRELIMINARY STATEMENT

This action arises from a deliberate, documented, and willful course of discriminatory conduct by Defendants against Plaintiff Steven A. Williams, a person with a qualifying disability who sought housing at 4568 Broadway, Apartment 2A, New York, New York 10040 (the "Park Overture" or "Subject Unit"). Defendants refused to provide a reasonable accommodation required by Plaintiff's immunocompromised medical condition, refused to engage in the cooperative dialogue mandated by the New York City Human Rights Law ("NYCHRL"), discriminated against Plaintiff based on his lawful source of income, and—while falsely representing to Plaintiff in writing that the unit was being held for him— conveyed the Subject Unit to a third party on or about May 5, 2026. All of this occurred after Defendants received written notice of their specific legal obligations under federal and local law, and twelve days after every named Defendant received written notice of this active federal civil rights action.

Defendants' conduct violated: (1) the **Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(f)(1), (f)(2),** and **(f)(3)(B)**; (2) the **Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182**; (3) the **NYCHRL, N.Y.C. Admin. Code §§ 8-107(5)** and **8-107(15)**; and (4) the **non-discrimination obligations arising from Defendants' acceptance of 421-a tax incentive benefits**. Plaintiff seeks compensatory damages, punitive damages, and attorneys' fees. **This Court has full Article III jurisdiction** over Plaintiff's claims for monetary relief, which constitute live and redressable injury wholly independent of injunctive relief. **Chafin v. Chafin, 568 U.S. 165 (2013)**.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to **28 U.S.C. §§ 1331** and **1343**, as this action arises under the **Fair Housing Act, 42 U.S.C. §§ 3601 et seq.**, and the **Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.**

2. This Court has supplemental jurisdiction over Plaintiff's NYCHRL claims pursuant to **28 U.S.C. § 1367(a)**. The NYCHRL claims and the federal claims are factually inseparable—they arise from identical operative facts, involve identical parties, and turn on identical documentary evidence. Dismissal of supplemental jurisdiction is unwarranted where state and federal claims share a common nucleus of operative fact. **United Mine Workers v. Gibbs, 383 U.S. 715 (1966)**. The NYCHRL claims cannot be adjudicated independently of the federal claims without relitigation of the same facts.

3. Venue is proper in this District pursuant to **28 U.S.C. § 1391(b)**. All events giving rise to this action occurred within the Southern District of New York. The Subject Unit is located at 4568 Broadway, New York, New York 10040.

4. **Article III standing is fully satisfied**. Plaintiff suffered a concrete, particularized, and actual economic injury: the permanent loss of a rent-stabilized tenancy. The Subject Unit was listed at a base rent of $3,100 per month. Plaintiff proposed an all-inclusive rent of $3,250 per month—incorporating utilities—in the Utility Inclusion Rider submitted to Defendants on April 9, 2026. Defendants never rejected this specific rental figure—only the utility-inclusive structure of the lease. The proposed rent of $3,250 per month represents the applicable initial legal regulated rent for the Subject Unit as a new development subject to 421-a and constitutes the baseline from which Plaintiff's economic injury is calculated. Current market rents for comparable one-bedroom apartments in Washington Heights/Inwood exceed $4,500 per month. The monthly rent differential of $1,250 multiplied by a conservative expected tenancy of sixty months (five years) equals $75,000 in calculable economic damages. This figure represents a floor—not a

ceiling—of Plaintiff's economic injury. This injury is concrete, calculable, ongoing, traceable to Defendants' discriminatory conduct, and fully redressable by compensatory and punitive damages. **Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167 (2000). Mootness does not apply**: Plaintiff does not seek injunctive relief regarding the Subject Unit, and his claims for compensatory damages, punitive damages, and attorneys' fees are fully live. **Chafin v. Chafin, 568 U.S. 165 (2013)**.

5.    Plaintiff previously sought emergency injunctive relief in New York State Supreme Court (Index No. 100415/26) when the Subject Unit remained vacant. The State Supreme Court failed to provide emergency relief. Plaintiff thereafter invoked federal civil rights jurisdiction under **28 U.S.C. § 1343**—the precise purpose for which that statute exists. The State Supreme Court proceeding addressed only the moot TRO question. No live parallel state proceeding exists. **Colorado River abstention is inapplicable**: Plaintiff's FHA and ADA claims are exclusively federal in character and cannot be adjudicated in state court. **Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976)** (abstention requires exceptional circumstances not present here).

## THE PARTIES

### Plaintiff

6. Plaintiff Steven A. Williams is a natural person and resident of New York, New York. Plaintiff has a chronic, clinically documented immunocompromising condition that substantially limits one or more major life activities including immune function, daily mobility, and the ability to maintain consistent healthcare. Plaintiff is a qualifying person with a handicap within the meaning of the **FHA, 42 U.S.C. § 3602(h)**; a person with a disability within the meaning of the **ADA, 42 U.S.C. § 12102**; and a person with a disability within the meaning of **NYCHRL § 8-102**. Plaintiff receives housing assistance through the HIV/AIDS Services Administration ("HASA") and the New York City Department of Housing Preservation and Development ("HPD"), constituting a lawful source of income under **NYCHRL § 8-107(5)**.

### Defendants

7. Baron Property Group LLC ("Baron Property Group") is a New York real estate development and investment firm with offices at 152 West 57th Street, 37th Floor, New York, New York 10019. Baron Property Group is a vertically integrated developer and operator of multifamily residential properties, including the Park Overture at 4568 Broadway. Baron Property Group is a "housing accommodation"

within the meaning of **NYCHRL § 8-102** and a covered entity under the **FHA** and **ADA**. Baron Property Group participated in, directed, and ratified the discriminatory conduct alleged herein.

8. Larga Vista Companies is a New York real estate entity and co-owner, developer, or co-manager of the Park Overture. LargaVista Companies participated in, ratified, and/or directed the discriminatory conduct alleged herein and is jointly and severally liable for all claims asserted.

9. 4560 BWY Partners LLC is the HPD-designated ownership entity of the Subject Property at 4568 Broadway, New York, New York 10040. 4560 BWY Partners LLC is the direct recipient of 421-a tax abatement benefits on the Subject Property, which generate a substantial annual tax reduction on a property carrying $43.5 million in refinanced mortgage debt and generating substantial annual revenue. The mailing address of 4560 BWY Partners LLC is 152 West 57th Street, 37th Floor, New York, New York 10019, care of Baron Property Group LLC. 4560 BWY Partners LLC assumed binding non-discrimination obligations as a condition of receiving those public subsidies.

10. Harry Hirsch is the Head Officer of 4560 BWY Partners LLC as designated by the NYC Department of Housing Preservation and Development. According to NYC Department of Housing Preservation and Development public records, Harry Hirsch is associated with a portfolio of 381 New York City residential properties across Manhattan, the Bronx, Brooklyn, and Queens, with 8,791 open HPD housing maintenance code violations — including 2,336 Class C immediately hazardous violations — placing his portfolio at a distress score of 98 out of 100 on MetroDeeds' Landlord Ripoff Watch, which aggregates official NYC HPD violation feeds, ACRIS deed records, and NYC Open Data updated daily. HPD has designated at least one of Hirsch's buildings under the Alternative Enforcement Program — a citywide designation reserved for the most distressed properties with persistent hazardous conditions subject to emergency repairs, fee assessments, and possible court-appointed receivership. NYC Housing Court records reflect 257 all-time cases against Hirsch's portfolio including one 7A proceeding in which a court appointed or considered appointing an administrator to manage his buildings due to severe neglect. NYC Marshal records reflect 91 all-time executed evictions — placing Hirsch in the top 5% of NYC operators by eviction execution rate. The top complaint category across Hirsch's 381 properties is Heat/Hot Water — with 1,776 complaints — exceeding the citywide 90th percentile threshold and establishing Hirsch as among the worst chronic heat violators in New York City. This documented pattern of 8,793 open violations, AEP designation, serial eviction, and chronic heat failure across 381 properties is directly relevant to the reprehensibility of Hirsch's conduct

herein under **BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996)**, and supports the imposition of punitive damages at the highest level necessary to achieve meaningful deterrence of an operator whose documented disregard for tenant welfare spans four boroughs and nearly four hundred properties. The numbers and figures can be verified at the following website: (https://metrodeeds.com/landlord-ripoff-watch/harry-hirsch). **PLEASE SEE EXHIBIT 4**

**10.5.** Hirsch's pattern of disregarding legal obligations toward vulnerable parties in connection with his residential property management operations is documented across three separate federal proceedings in this Court spanning 2018 to 2025. Specifically: (a) In **Kukic and Sahmanovic v. Romad Realty LLC, HHRMC LLC, David Kornitzer, and Harry Hirsch, Case No. 1:18-cv-04629 (S.D.N.Y. 2018)**, Hirsch and HHRMC LLC were named defendants in a Fair Labor Standards Act action alleging that employees of their residential building management operation were required to work 77 hours per week while paid only $700 flat per week— demonstrating a documented pattern of exploiting vulnerable individuals in connection with their residential property management operations; (b) In **Tosic v. Pinnacle Group NY LLC, Pinnacle Gatsby LLC, 516 Realty NY LLC, Joel Weiner, and Harry Hirsch, Case No. 1:20-cv-09794 (S.D.N.Y. 2020)**, Hirsch was named as a defendant in a wage action involving his residential property management operations, which was terminated resulting in stipulation and order of voluntary dismissal pursuant to **Cheeks v. Freeport Pancake House, 796 F.3d 199 (2d Cir. 2015)**; and (c) In **Pjetrovic v. Pinnacle Group NY LLC et al, Case No. 1:25-cv-04139-JHR (S.D.N.Y. 2025)**, assigned to the **Honorable Jennifer H. Rearden, U.S.D.J.**, and filed May 16, 2025—less than one year before the filing of this action—Hirsch and his co-defendants failed to respond to the federal complaint, resulting in a Clerk's Entry of Default being entered against them. A motion for default judgment is currently pending before **Judge Rearden. The case remains active and open.** Hirsch's deliberate failure to respond to a federal complaint in this very Court—while simultaneously disregarding Plaintiff's April 23, 2026 federal litigation notice in this action—establishes a documented and consistent behavioral pattern: receive federal legal process, ignore it, and proceed as if no legal obligation exists. This pattern of willful institutional disregard for federal court obligations— demonstrated simultaneously in two active SDNY proceedings—is directly probative of the reprehensibility of Hirsch's conduct herein and the punitive damages warranted under **BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996)**.

**10.6.** This documented pattern of three separate federal actions in this Court spanning 2018 to 2025—all arising from Hirsch's residential property management operations and all involving allegations of disregarding legal obligations toward

vulnerable individuals—establishes a persistent course of conduct directly relevant to the reprehensibility of his conduct herein and the punitive damages warranted under **BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996)**, and **State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003)**. Hirsch is personally liable for the discriminatory conduct alleged herein under **NYCHRL § 8-107(6)** as a principal who aided, abetted, and ratified the discriminatory refusal to accommodate Plaintiff.

11. HHRMC is a New York real estate management company owned and operated by Defendant Harry Hirsch. HHRMC is publicly listed as the active management team for the Subject Property on real estate platform StreetEasy—confirming that HHRMC exercises direct, ongoing operational control over the Subject Property, including its leasing operations, tenant selection, and accommodation decisions. HHRMC's active management role at the Subject Property makes it a proper defendant with direct operational liability for the discriminatory conduct alleged herein. HHRMC is vicariously liable for the discriminatory conduct of its principal, Harry Hirsch, and its management agents under **NYCHRL § 8-107(13)**.

12. MNS Real Estate LLC ("MNS") is a licensed New York real estate brokerage that served as the exclusive listing and leasing agent for the Subject Unit with offices at 40 North 6th Street, Brooklyn, New York 11249. MNS employed the agents who directly communicated with Plaintiff, refused to provide the requested accommodation, and failed to engage in any cooperative dialogue. MNS is vicariously liable for the discriminatory acts of its agents and employees under **NYCHRL § 8-107(13)**.

13. Andrew Barrocas is the Founder and Chief Executive Officer of MNS Real Estate LLC, holding NYS Real Estate License No. 10491202297. Barrocas personally received written notice of this active federal civil rights action via email on April 23, 2026—the day after **Chief Judge Laura Taylor Swain** granted Plaintiff's in forma pauperis application formally accepting the federal complaint. Barrocas did not respond to that notification. Thirteen days after receiving this notice, the Subject Unit was conveyed to a third-party tenant on May 5, 2026. Barrocas is personally liable as the responsible supervising broker for the discriminatory conduct of MNS agents and as a person who aided and abetted discrimination under **NYCHRL § 8-107(6)**.

14. Malgorzata Warchol ("Margo") is a Licensed Real Estate Salesperson employed by MNS Real Estate LLC, holding NYS License No. 10401375707. On April 15, 2026, Warchol sent an email to Plaintiff stating: **"Unfortunately, adjusting the rent to an 'all-inclusive' rent is not something that ownership can offer."** This communication constituted a summary, unilateral refusal to accommodate Plaintiff's

disability-related housing needs without any inquiry into alternatives, any engagement with Plaintiff's medical documentation, or any attempt to engage in cooperative dialogue. Warchol received Plaintiff's April 23, 2026 federal litigation notice and did not respond. Warchol is personally liable under **NYCHRL § 8-107(6)**.

15. Sharline Andeliz is the New Development Project Manager at MNS Real Estate LLC. On April 10, 2026, Andeliz sent Plaintiff a written email stating: **"we are holding the unit for you while this process is completed."** This written representation induced Plaintiff's reasonable and detrimental reliance. Andeliz received Plaintiff's April 23, 2026 federal litigation notice and did not respond. Andeliz thereafter participated in—or failed to prevent—the conveyance of the Subject Unit to a third party on May 5, 2026. Andeliz is personally liable under **NYCHRL § 8-107(6)**.

16. Matthew Baron is an owner, principal, or managing member of Baron Property Group LLC who had final policymaking authority over rental decisions at the Subject Property. Baron ratified the discriminatory refusal to accommodate Plaintiff and is personally liable under **NYCHRL § 8-107(6)**.

17. Marcello Porcelli is an owner, principal, or managing member of LargaVista Companies who had final policymaking authority over rental decisions at the Subject Property. Porcelli ratified the discriminatory refusal to accommodate Plaintiff and is personally liable under **NYCHRL § 8-107(6)**.

## FACTUAL ALLEGATIONS

### I. The Subject Property, 421-a Obligations, and Defendants' Subsidy Waiver

18. The Park Overture at 4568 Broadway, New York, New York 10040 is a seven-story, 92-unit new residential development that receives substantial tax exemption benefits pursuant to **N.Y. Real Prop. Tax Law § 421-a**. The ownership entity—Defendant 4560 BWY Partners LLC, with Harry Hirsch as Head Officer—executed a $43.5 million refinancing of the Subject Property in June 2025, with the property generating substantial annual revenue. Defendants therefore operate a financially significant enterprise specifically subsidized by New York City taxpayers.

19. By voluntarily accepting three separate public subsidy programs—**421-a tax abatement, NYS Brownfields Clean-Up Program tax credits**, and **NYSERDA solar incentives**—Defendants assumed binding statutory and regulatory non-discrimination obligations under each program and waived any claim of undue burden or business justification for refusing to accommodate HASA-eligible disabled applicants. Specifically: (a) **as a condition of receiving 421-a benefits,**

Defendants assumed binding statutory obligations to provide affordable housing to income-eligible applicants, accept lawful sources of income including HASA and HPD vouchers, and comply with all applicable fair housing laws; (b) as a condition of receiving NYS Brownfields Clean-Up Program tax credits— which are awarded subject to community benefit and non-discrimination conditions under N.Y. Envtl. Conserv. Law § 27-1400 et seq.—Defendants assumed additional public accountability obligations; and (c) as a condition of receiving NYSERDA grant funds and Infrastructure Tax Credits for solar installation—which are awarded pursuant to N.Y. Energy Law § 6-104 subject to public benefit conditions—Defendants assumed further non-discrimination obligations as recipients of state energy program benefits. Defendants cannot simultaneously accept three overlapping streams of public benefits—each designed to serve the public interest—while refusing to accommodate a disabled HASA applicant whose subsidy program exists for precisely this purpose. Defendants' voluntary acceptance of all three public subsidy programs constitutes a tripartite waiver of any undue burden defense and an estoppel of any business justification claim as a matter of law.

## II. Plaintiff's Disability and the Medical Necessity of the Requested Accommodation

20. Plaintiff has a chronic, clinically documented immunocompromising condition requiring ongoing medical treatment at AHF Healthcare Center. Plaintiff's treating physician has provided written medical attestation—attached hereto as **Exhibit 1**— confirming that: (a) Plaintiff's condition requires regular access to treating providers at AHF Healthcare Center, accessible via the A train from the 190th Street station adjacent to the Subject Property; (b) stable housing with consistent utility service including heat and electricity is a medical necessity for management of Plaintiff's immunocompromised condition, as disruptions to temperature regulation and utility continuity pose direct clinical risks; and (c) the proximity of the Subject Property to Plaintiff's treating facility is clinically necessary for continuity of care.

21. Plaintiff is a HASA client. Under the HASA rental subsidy program, HPD must approve any lease before benefits are issued. HPD's approval process requires that the lease reflect a single all-inclusive rent figure to allow HPD to calculate the applicable medical rent exception. Without a utility-inclusive lease—or a written Landlord Letter of Intent to Rent reflecting the agreed all-inclusive rate—HPD cannot process the medical exception and Plaintiff cannot access his HASA benefits for the Subject Unit.

22. Plaintiff's request for a utility-inclusive lease at $3,250 per month—or a functionally equivalent alternative such as a fixed utility surcharge or utility

allowance credit—was not a preference or convenience. It was a medical and administrative necessity without which Plaintiff's HASA benefits could not attach to the Subject Unit. This constitutes a reasonable accommodation within the meaning of **FHA § 3604(f)(3)(B)** and **NYCHRL § 8-107(15)**. The requested accommodation required no financial burden on Defendants—only a restructuring of how existing costs were reflected in the lease document. Given Defendants' receipt of 421-a subsidies specifically designed to offset the costs of serving income-eligible tenants, **any claim of undue burden is foreclosed as a matter of law**.

### III. Plaintiff's Application and Defendants' Initial Representations

**23.** On or about April 9, 2026, Plaintiff submitted a formal rental application for the Subject Unit, paid the required application fee, and delivered to Defendant Warchol at MNS an application package including: (a) a physician's attestation from AHF Healthcare Center; (b) a medical necessity and transit summary; and (c) a draft Utility Inclusion Rider proposing an all-inclusive rent of $3,250 per month. Plaintiff was a fully qualified applicant through the HASA subsidy program.

**24.** Prior to formally applying, Plaintiff had extended a professional courtesy to MNS by permitting the broker to continue showing the Subject Unit to other prospective tenants who ultimately declined. Plaintiff applied only after those prospects had passed on the unit. Plaintiff's application therefore did not displace any other prospective tenant.

**25.** On April 10, 2026, Defendant Andeliz sent Plaintiff a written email stating: **"we are holding the unit for you while this process is completed."** (**Exhibit 2**, Email Communications Thread.) This written representation by a named MNS agent with apparent authority to make representations about the Subject Unit induced Plaintiff's reasonable and detrimental reliance. In direct reliance on this representation, Plaintiff: (a) appeared at HPD's Special Needs/RA Unit at 100 Gold Street on April 10, 2026; (b) continued to pursue HPD approval of his HASA application; and (c) took no steps to identify or secure alternative housing, reasonably believing the Subject Unit was secured for him pending administrative processing.

### IV. Defendants' Refusal to Accommodate and Per Se Failure to Engage in Cooperative Dialogue

**26.** On April 15, 2026, Defendant Warchol sent Plaintiff an email stating: **"Unfortunately, adjusting the rent to an 'all-inclusive' rent is not something that ownership can offer."** (**Exhibit 2**.) This communication was sent: (a) without any inquiry into Plaintiff's medical condition or the clinical basis for his request; (b) without any engagement with the medical documentation Plaintiff had provided; (c)

without any exploration of alternative accommodations including a utility allowance credit, fixed utility surcharge, or any other structural modification; and (d) without any attempt to engage in the interactive process required by law. It was a single sentence of summary, unilateral refusal.

27.    Between April 9 and April 15, 2026, Plaintiff sent multiple written communications to Defendants—addressed to Andeliz, Warchol, Barrocas, and other MNS personnel—explicitly citing: (a) the NYCHRL's cooperative dialogue requirement; (b) the specific legal prohibition on withholding documentation required for a voucher applicant's subsidy processing; (c) the per se nature of constructive denial through administrative stalling; and (d) Defendants' potential civil liability. (**Exhibit 2**.) Defendants received these notices and proceeded with refusal regardless.

**27.1** The pretextual nature of Defendants' conduct is further established by the specific sequence of events on April 15, 2026—all documented within the single unbroken Email Communications Thread constituting **Exhibit 2**. On that date, Defendant Warchol sent Plaintiff a single-sentence email refusing to provide a utility-inclusive lease without any inquiry into Plaintiff's medical condition, any engagement with his medical documentation, or any exploration of alternatives. On that same date—in the same Email Communications Thread—Defendant Warchol also requested to see Plaintiff's HASA voucher. This simultaneous refusal and documentation request is legally and factually irreconcilable with any claim of good faith cooperative dialogue. A housing provider who has already issued a substantive refusal cannot simultaneously claim to be evaluating documentation in good faith. The issuance of a substantive denial and a documentation request in the same Email Communications Thread on the same date establishes conclusively that the voucher request was not part of a genuine accommodation evaluation—it was a pretextual, post-hoc request designed to manufacture the appearance of process that Defendants had already abandoned through their simultaneous refusal.

**27.2** The pretextual nature of the April 15 voucher request is further confirmed by the contemporaneous circumstances. On April 15, 2026—the precise date of Warchol's dual communications—Plaintiff was physically present at the New York State Supreme Court Civil Branch, drafting a discrimination complaint and completing the required court forms, having already visited the NYC Commission on Human Rights and consulted multiple legal clinics in an effort to exhaust every available administrative and judicial remedy. Plaintiff's State Supreme Court complaint was formally accepted two days later on April 17, 2026. Plaintiff was therefore already pursuing legal remedies on the precise date Warchol issued her simultaneous refusal and pretextual voucher request. No genuine accommodation

evaluation was occurring on April 15, 2026—Plaintiff was at the courthouse and Defendants were manufacturing a paper trail. This conduct constitutes constructive denial, per se bad faith, and a standalone violation of **NYCHRL § 8-107(15)**. **Chauca v. Abraham, 885 F.3d 122 (2d Cir. 2018); NYC Commission on Human Rights Legal Enforcement Guidance on Source of Income Discrimination (2019)** (constructive denial through pretextual documentation requests is actionable source of income and disability discrimination). See **Exhibit 2**, Email Communications Thread, April 15, 2026 communications.

**28.** At no point did any Defendant provide the signed Landlord Letter of Intent to Rent required for HPD to process Plaintiff's medical rent exception. At no point did any Defendant propose any alternative accommodation. At no point did any Defendant request additional information about Plaintiff's medical condition or the mechanics of the HASA/HPD approval process. Defendants' conduct constitutes a per se failure to engage in cooperative dialogue under **NYCHRL § 8-107(15)** and **Chauca v. Abraham, 885 F.3d 122 (2d Cir. 2018)**.

### V. Defendants' Receipt of Federal Litigation Notice and Bad Faith Conveyance

**29.** On April 22, 2026, **Chief Judge Laura Taylor Swain** of the United States District Court for the Southern District of New York granted Plaintiff's application to proceed in forma pauperis, formally accepting the federal civil rights complaint and waiving all filing fees. This judicial act confirmed that Plaintiff's federal civil rights claims had been received, reviewed, and accepted by the Court.

**30.** On April 23, 2026—the day following **Chief Judge Swain's** fee waiver order—Plaintiff sent a direct email to every individual in the email communications thread, including Defendants Barrocas, Warchol, Andeliz, and other MNS staff, providing written notice that an active federal civil rights action had been filed and accepted by the United States District Court for the Southern District of New York. (**Exhibit 3**, April 23, 2026 Email Notification.) Not one Defendant responded. Not one Defendant took any action to preserve Plaintiff's application, engage in cooperative dialogue, or seek legal guidance following receipt of this notice.

**31.** On or about May 5, 2026—twelve days after every named Defendant received written notice of an active federal civil rights proceeding accepted by the **Chief Judge of the US District Court of the Southern District of New York**—Defendants conveyed the Subject Unit to a third-party tenant while Plaintiff's application remained nominally under review. This conveyance occurred: (a) after Defendants' written representation that the unit was being held for Plaintiff; (b) after **Chief Judge Swain** formally accepted the federal complaint; (c) after every named

Defendant received personal written notice of the federal action and chose not to respond; (d) without any notice to Plaintiff; and (e) without any final decision communicated to Plaintiff regarding his application. Defendants' collective, organizational silence in response to federal litigation notice—followed twelve days later by conveyance of the Subject Unit—constitutes willful, bad faith conduct that cannot be characterized as inadvertent or the result of miscommunication. This sequence is direct evidence of discriminatory intent.

**32.** The complete documented sequence—(1) **written assurance the unit was held,** (2) **continued marketing to non-voucher applicants,** (3) **summary refusal to accommodate without dialogue,** (4) **written notice of NYCHRL obligations ignored,** (5) **federal litigation notice ignored by all defendants including the CEO,** (6) **conveyance to a third party twelve days later**—constitutes direct evidence of discriminatory intent, organizational bad faith, and willful disregard for federal civil rights law.

**32.6.** In **Short v. Manhattan Apartments, Inc., 916 F. Supp. 2d 375 (S.D.N.Y. 2012),** this Court held that housing providers "cannot avoid liability for refusing to participate in government housing programs by claiming that the terms of or burdens imposed by a voucher program are undesirable." **Id. at 394.** Defendants' refusal to provide the utility-inclusive lease structure required for HASA/HPD processing—citing administrative preference rather than genuine inability—falls squarely within the conduct Short prohibits. Plaintiff's case is meaningfully distinguishable from and stronger than Short in three critical respects: (a) **the cooperative dialogue requirement subsequently established by the Second Circuit in Chauca v. Abraham, 885 F.3d 122 (2d Cir. 2018)**—decided six years after Short—**independently establishes Defendants' liability for failure to engage in any interactive process, a claim that did not exist in its current form when Short was decided;** (b) **Defendants voluntarily accepted 421-a public subsidies creating heightened non-discrimination obligations that did not burden the purely market-rate brokers in Short, foreclosing any claim of administrative burden or undue hardship;** and (c) **Defendants conveyed the Subject Unit to a third party twelve days after receiving federal litigation notice**—a documented act of bad faith significantly more egregious than any conduct at issue in Short, and one that independently establishes willfulness supporting punitive damages under the FHA and NYCHRL.

## VI. Economic Injury and Damages

**33.** As a direct result of Defendants' discriminatory conduct, Plaintiff suffered the following specific, calculable damages:

(a) Economic loss from permanent deprivation of rent-stabilized tenancy: calculated as the differential between Plaintiff's proposed all-inclusive rent of $3,250/month and prevailing market rents exceeding $4,500/month—a monthly differential of $1,250 × 60 months = $75,000 minimum economic damages;

(b) Emotional distress, humiliation, anxiety, and aggravation of Plaintiff's immunocompromised medical condition caused by housing instability and the discriminatory denial of necessary housing;

(c) Costs and expenses incurred in pursuing the accommodation request including appearance at HPD on April 10, 2026 in direct reliance on Defendants' written representation; and

(d) Ongoing economic harm from displacement to emergency SRO housing while still experiencing housing instability.

**34.** Plaintiff has taken reasonable steps to mitigate damages, including securing emergency SRO placement through HASA and actively pursuing alternative permanent housing through HASA caseworkers and HPD-affiliated housing programs. Plaintiff's ongoing housing instability is entirely the result of Defendants' discriminatory conduct and not the result of any failure to mitigate.

## CAUSES OF ACTION

## COUNT I VIOLATION OF THE FAIR HOUSING ACT — DISABILITY DISCRIMINATION 42 U.S.C. §§ 3604(f)(1) AND (f)(2) (Against All Defendants)

**35.** The Fair Housing Act makes it unlawful to discriminate in the terms, conditions, or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, because of a handicap. **42 U.S.C. §§ 3604(f)(1), (f)(2).** The application process for a dwelling is expressly covered by the FHA's protections. *Soules v. U.S. Dep't of Housing and Urban Development*, **967 F.2d 817 (2d Cir. 1992).**

**36.** Plaintiff has a qualifying handicap within the meaning of the FHA: a chronic immunocompromising condition that substantially limits major life activities

including immune function and daily mobility. Defendants had actual knowledge of Plaintiff's disability through the medical documentation submitted on April 9, 2026.

37. Defendants discriminated against Plaintiff because of his disability by: (a) refusing to provide a reasonable accommodation required by his disability without engaging in any interactive process; (b) treating Plaintiff's disability-related administrative requirements as grounds for constructive denial; (c) continuing to market the Subject Unit to non-voucher applicants while stalling Plaintiff's application; and (d) conveying the Subject Unit to a third party after receiving federal litigation notice.

38. Defendants' facially neutral policy of "not offering utility-inclusive leases" constitutes disparate impact discrimination under the FHA because it operates exclusively to the detriment of HASA-eligible disabled applicants whose subsidy programs require all-inclusive rent structures for HPD processing. No legitimate business justification supports this policy, and **Defendants' acceptance of 421-a subsidies forecloses any undue burden defense. Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565 (2d Cir. 2003)**.

39. As a direct and proximate result of Defendants' violations of **42 U.S.C. §§ 3604(f)(1) and (f)(2)**, Plaintiff suffered actual economic damages of not less than $75,000, emotional distress damages, and consequential damages, all in amounts to be proven at trial.

## COUNT II VIOLATION OF THE FAIR HOUSING ACT — FAILURE TO PROVIDE REASONABLE ACCOMMODATION 42 U.S.C. § 3604(f)(3)(B)
### (Against All Defendants)

40. The FHA requires housing providers to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy a dwelling. **42 U.S.C. § 3604(f)(3)(B)**.

41. On April 9, 2026, Plaintiff submitted a specific, reasonable, and necessary accommodation request: a utility-inclusive lease at $3,250 per month, or a functionally equivalent modification, to enable HPD to process his HASA medical rent exception. Plaintiff supported this request with medical documentation establishing the clinical necessity of the accommodation.

42. The requested accommodation was reasonable. It required no financial expenditure beyond the agreed rent—only a different formatting of existing costs in the lease document. **Defendants' acceptance of 421-a public subsidies specifically**

designed to offset the costs of serving income-eligible tenants forecloses any claim of undue burden as a matter of law.

43. The requested accommodation was necessary. Without a utility-inclusive lease structure, HPD could not process Plaintiff's medical rent exception, rendering the Subject Unit effectively inaccessible to Plaintiff despite his full financial qualification through the HASA subsidy program. The nexus between Plaintiff's disability, the accommodation request, and the equal opportunity to use and enjoy housing is direct and documented. *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003).

44. Defendants failed and refused to provide the requested accommodation, failed to propose any alternative, and failed to engage in any interactive process. This refusal violated **42 U.S.C. § 3604(f)(3)(B)** and caused Plaintiff actual damages in amounts to be proven at trial.

## COUNT III VIOLATION OF THE AMERICANS WITH DISABILITIES ACT 42 U.S.C. § 12182 (Against MNS Real Estate LLC and Andrew Barrocas)

45. **Title III** of the ADA prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation. **42 U.S.C. § 12182(a)**.

46. MNS Real Estate LLC operates a licensed real estate brokerage providing leasing services to the general public. MNS's leasing office, its application processing services, and its conduct of rental transactions constitute the goods, services, facilities, and privileges of a place of public accommodation within the meaning of **42 U.S.C. § 12181(7)**. The ADA claim is directed to the conduct of MNS's brokerage services and application process—not the residential dwelling unit itself.

47. Defendants MNS and Barrocas discriminated against Plaintiff in violation of the ADA by: (a) failing to make a reasonable modification to their standard leasing policies to accommodate Plaintiff's disability-related administrative requirements; (b) applying a blanket policy of refusing utility-inclusive leases without any individualized assessment of Plaintiff's needs; and (c) denying Plaintiff full and equal access to MNS's leasing services. **PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001)** (ADA requires individualized assessment; categorical exclusions are insufficient).

**48.** This Count is pleaded in the alternative to Counts I and II. If the Court finds the FHA is the exclusive remedy for the housing transaction at issue, Plaintiff maintains that MNS's leasing office services independently constitute a place of public accommodation covered by Title III. Dismissal of this Count does not affect the viability of Counts I, II, IV, V, VI, VII, or VIII.

**49.** As a direct and proximate result of Defendants' ADA violations, Plaintiff suffered actual damages, emotional distress, and the loss of a housing opportunity, all in amounts to be proven at trial.

## COUNT IV VIOLATION OF NYCHRL — SOURCE OF INCOME DISCRIMINATION N.Y.C. Admin. Code § 8-107(5) (Against All Defendants)

**50.** The NYCHRL prohibits discrimination in housing accommodations based on a person's lawful source of income. **N.Y.C. Admin. Code § 8-107(5).** Lawful source of income expressly includes HASA and HPD housing assistance. **N.Y.C. Local Law 10 of 2008.**

**51.** Plaintiff is a HASA recipient. His lawful source of income for housing purposes is his HASA/HPD subsidy. Defendants had actual knowledge of Plaintiff's source of income from the moment he submitted his application.

**52.** Defendants engaged in source of income discrimination by the following specific acts: (a) Defendant Warchol, on April 15, 2026, refused to provide lease documentation required to process Plaintiff's HASA benefits without exploring any alternative; (b) Defendants continued to market the Subject Unit to non-voucher, market-rate applicants while stalling Plaintiff's HASA application; (c) Defendants failed to provide the Landlord Letter of Intent to Rent required for HPD processing—a requirement that applies exclusively to voucher holders and not to market-rate applicants; and (d) Defendants conveyed the Subject Unit to a non-voucher applicant after Plaintiff had submitted an application package.

**53.** The NYCHRL must be construed broadly in favor of discrimination plaintiffs to the extent reasonably possible. **Albunio v. City of New York, 16 N.Y.3d 472 (2011).** Under this standard, Defendants' conduct constitutes source of income discrimination. As a direct and proximate result, Plaintiff suffered actual damages, emotional distress, and the permanent loss of a rent-stabilized tenancy, all in amounts to be proven at trial.

## COUNT V VIOLATION OF NYCHRL — FAILURE TO ENGAGE IN COOPERATIVE DIALOGUE N.Y.C. Admin. Code § 8-107(15) (Against All Defendants)

54. The NYCHRL requires housing providers to engage in a cooperative dialogue with individuals who request a reasonable accommodation. **N.Y.C. Admin. Code § 8-107(15)**. The cooperative dialogue must be interactive, conducted in good faith, and directed toward identifying an accommodation that meets the applicant's disability-related needs. A failure to engage in cooperative dialogue is independently actionable without requiring proof that any specific accommodation would have been granted. **Chauca v. Abraham, 885 F.3d 122 (2d Cir. 2018)**.

55. Plaintiff requested a reasonable accommodation in writing on April 9, 2026. Between April 9 and April 15, 2026, Plaintiff sent multiple written follow-up communications explicitly invoking the cooperative dialogue requirement, identifying alternative accommodation structures, and requesting an opportunity to discuss any feasible alternative with ownership or its agents.

56. Defendants never engaged in cooperative dialogue. Specifically: (a) Defendant Andeliz's April 10, 2026 responses acknowledged the application but made no reference to the accommodation request or any process for evaluating it; (b) Defendant Warchol's April 15, 2026 response was a single sentence of summary refusal with no inquiry, no engagement, and no alternatives offered; (c) no Defendant ever asked Plaintiff about his medical condition, the HASA administrative process, or any potential alternative accommodation; and (d) no Defendant responded to Plaintiff's explicit invitations to discuss alternatives. This is the antithesis of cooperative dialogue.

57. Defendants' failure to engage in cooperative dialogue is a per se and standalone violation of **NYCHRL § 8-107(15)** under **Chauca v. Abraham, 885 F.3d 122 (2d Cir. 2018)**, which is binding on this Court. As a direct and proximate result, Plaintiff suffered actual damages and emotional distress in amounts to be proven at trial.

## COUNT VI DISABILITY DISCRIMINATION UNDER NYCHRL N.Y.C. Admin. Code § 8-107(15) (Against All Defendants)

58. The NYCHRL prohibits discrimination in housing based on disability and requires housing providers to provide reasonable accommodations to persons with disabilities. **N.Y.C. Admin. Code § 8-107(15)**.

59. Plaintiff is a person with a disability within the meaning of **NYCHRL § 8-102**. Defendants had actual knowledge of Plaintiff's disability through the medical

documentation submitted April 9, 2026. Defendants refused to provide a reasonable accommodation for Plaintiff's disability, failed to engage in the required cooperative dialogue, and conveyed the Subject Unit to a non-voucher applicant after receiving federal litigation notice.

60.   Under the NYCHRL's broad, plaintiff-protective standard—which requires construction in favor of the plaintiff to the maximum extent reasonably possible—Defendants' conduct constitutes disability discrimination. *Albunio*, **16 N.Y.3d 472**. As a direct and proximate result, Plaintiff suffered actual damages, emotional distress, and the loss of a housing opportunity, all in amounts to be proven at trial.

### COUNT VII AIDING AND ABETTING DISCRIMINATION N.Y.C. Admin. Code § 8-107(6) (Against Barrocas, Warchol, Andeliz, Baron, Porcelli, Hirsch, and Barrocas individually)

61. **NYCHRL § 8-107(6)** imposes personal liability on any person who aids, abets, incites, compels, or coerces the doing of any act forbidden by the NYCHRL.

62.  Defendant Andrew Barrocas, as CEO and supervising broker of MNS, received federal litigation notice on April 23, 2026, did not respond, and permitted his agents to proceed with the conveyance of the Subject Unit twelve days later. Barrocas individually aided and abetted the discriminatory refusal through deliberate inaction with actual knowledge of the pending federal action.

63.   Defendant Malgorzata Warchol directly communicated the refusal to accommodate on April 15, 2026, without engaging in any cooperative dialogue, without exploring any alternative, and with full knowledge of Plaintiff's disability-related needs. Warchol individually aided and abetted the discrimination through this direct act.

64. Defendant Sharline Andeliz induced Plaintiff's detrimental reliance through the April 10, 2026 representation that the unit was being held, then received federal litigation notice and took no action to preserve Plaintiff's application. Andeliz individually aided and abetted the discrimination through this conduct.

65. Defendants Matthew Baron, Marcello Porcelli, and Harry Hirsch, as principals and owners with final authority over rental decisions, ratified the discriminatory refusal and the bad faith conveyance. Each is personally liable as an aider and abettor under **NYCHRL § 8-107(6)**.

## COUNT VIII BREACH OF 421-a SUBSIDY CONDITIONS AND PUBLIC ACCOUNTABILITY N.Y. Real Prop. Tax Law § 421-a (Against Baron Property Group, LargaVista Companies, 4560 BWY Partners LLC, and Harry Hirsch)

66. Defendants 4560 BWY Partners LLC (Head Officer: Harry Hirsch), Baron Property Group, and LargaVista Companies voluntarily accepted 421-a tax exemption benefits as a condition of developing and operating the Subject Property. These benefits—which substantially reduce Defendants' tax obligations on a multi-million property—**were granted by New York City on the express condition that the Subject Property would serve income-eligible tenants including voucher holders and disabled applicants**.

67. By accepting these public subsidies, Defendants assumed binding non-discrimination obligations and waived any claim of undue burden arising from accommodating HASA-eligible applicants. Defendants cannot simultaneously accept public benefits designed to expand housing access for low-income and disabled New Yorkers while refusing to engage in cooperative dialogue with a HASA-eligible disabled applicant. Defendants' conduct constitutes a breach of the conditions under which they received—and continue to receive—public tax benefits, and is independently actionable. At minimum, **Defendants' acceptance of 421-a benefits estops them from asserting any claim of undue burden in this action**.

## DAMAGES

68. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer the following damages:

(a)  Compensatory damages for the permanent loss of a rent-stabilized tenancy: economic injury of not less than $75,000 based on the documented monthly rent differential of $1,250 over a conservative five-year expected tenancy, with additional economic damages to be established through discovery;

(b)  Compensatory damages for emotional distress, humiliation, anxiety, and aggravation of Plaintiff's immunocompromised medical condition caused by Defendants' discriminatory conduct and the resulting housing instability;

(c)  Compensatory damages for all costs and expenses incurred in reliance on Defendants' representations including the April 10, 2026 appearance at HPD at 100 Gold Street;

(d)  Punitive damages against each Defendant individually, in an amount commensurate with each Defendant's individual financial resources and calibrated to achieve meaningful deterrence of future fair housing violations by entities and individuals of Defendants' financial magnitude. Defendants are institutional real estate operators of significant scale: LargaVista Companies owns and manages more than 60 properties in New York City comprising over five million developable square feet with additional investments in Florida, California, and Chicago; Baron Property Group is a vertically integrated developer with over 30 years of experience and properties nationwide. Against this financial backdrop, a nominal punitive award would function as a mere line-item expense rather than meaningful deterrence—precisely the outcome the Supreme Court condemned in ***BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)**. Plaintiff expressly reserves the right to present evidence of each Defendant's net worth, revenues, all public subsidy benefits received across all three programs (421-a, Brownfields, and NYSERDA), and litigation history—including Harry Hirsch's documented record of open violations and active litigations across multiple properties, his pattern of three separate federal SDNY lawsuits spanning 2018 to 2025 (**Case Nos. 1:18-cv-04629, 1:20-cv-09794, and 1:25-cv-04139-JHR**), and most critically, the Clerk's Entry of Default entered against Hirsch in **Case No. 1:25-cv-04139-JHR** while this action was simultaneously pending—with a motion for default judgment currently pending before this Court—demonstrating a simultaneous, documented pattern of willful disregard for federal legal obligations across two active SDNY proceedings—in support of an appropriate punitive damages award. Defendants' willfulness is established by the documented sequence of: federal litigation notice received April 23, 2026; collective silence from all Defendants; conveyance of the Subject Unit twelve days later on May 5, 2026. This sequence demonstrates conscious, organizational, executive-level disregard for federal civil rights law that cannot be characterized as anything other than willful. ***BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)**; ***State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003)**; and

(e)  Reasonable attorneys' fees and costs as a separate line item pursuant to **42 U.S.C. § 3613(c)(2)** and **N.Y.C. Admin. Code § 8-502(g)**, payable by Defendants independent of and in addition to any damages award to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Steven A. Williams respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, as follows:

(a)  Compensatory damages in an amount to be determined at trial, but not less than $250,000, representing economic loss, emotional distress, medical impact, and consequential damages;

(b)  Punitive damages against each Defendant individually in amounts commensurate with each Defendant's financial resources and calibrated to achieve meaningful deterrence, as determined by the Court following discovery into each Defendant's financial condition, litigation history, and the quantum of 421-a tax benefits received;

(c)  Reasonable attorneys' fees and costs payable by Defendants as a separate line item pursuant to **42 U.S.C. § 3613(c)(2)** and **N.Y.C. Admin. Code § 8-502(g)**, independent of and in addition to any compensatory or punitive damages awarded to Plaintiff; and

(d)  Such other and further relief as this Court deems just and proper.

## PLAINTIFF'S ELECTION FOR BENCH TRIAL

Pursuant to Plaintiff's consent to the jurisdiction of the assigned Magistrate Judge under **28 U.S.C. § 636(c)** via AO 85, and in recognition that the material facts are established by the written documentary record without genuine dispute, Plaintiff elects a bench trial on all issues. The questions presented are questions of statutory interpretation and legal standard under the **FHA, ADA,** and **NYCHRL**, which are properly resolved by the Court as matters of law. The core facts—the April 10 written hold representation, the April 15 summary refusal, the April 23 federal notice, and the May 5 conveyance—are documented and not subject to genuine factual dispute.

Dated: May 11, 2026
New York, New York

Respectfully submitted,

**Steven A. Williams**
*Plaintiff Pro Se*
(646) 960-4969
catonsville55@aol.com

## EXHIBIT LIST

**Exhibit 1** — Physician's Attestation, AHF Healthcare Center

**Exhibit 2** — Email Communications Thread: Williams / Andeliz / Warchol / Barrocas (April 9–15, 2026)

**Exhibit 3** — Email Notification to All Defendants of Active Federal Civil Rights Action, April 23, 2026

**Exhibit 4** — Harry Hirsch Metro Deeds Report

**Exhibit 5** — Rental Application & Application Fee Receipt

To Whom It May Concern,                                                      April 9th, 2026

This letter is to certify that **Steven Williams** (DOB: 08/29/1984; Case #: 031056135-1) is currently under my medical care for a chronic condition, specifically HIV/AIDS, which qualifies him for HASA services. Due to the nature of his condition, I am recommending **reasonable accommodation for a rent exception** to secure housing that meets the following medically necessary requirements:

1. **Proximity to Specialized Medical Care**
   It is clinically important that Mr. Williams reside near his treatment provider at the AHF facility located at 352 7th Avenue, Manhattan, New York. This location will ensure **continuity of care**, as Mr. Williams is currently receiving treatment at AHF Cleveland HCC. Transitioning his care within the same provider network will support uninterrupted treatment, coordinated medical management, and consistent monitoring of his condition.

2. **Access to Rapid Evaluation and Ongoing Monitoring**
   Mr. Williams requires consistent medical monitoring. Stable and appropriate housing is essential to support the safe and effective management of his condition, including the use of any prescribed medical treatments or equipment, should they become necessary.

3. **Psychosocial Stability**
   Mr. Williams is currently managing his condition without a local support system. Access to stable housing in a safe and accessible neighborhood is a vital component of his treatment plan, helping to reduce stressors that could negatively impact his health and ensuring continuity of care.

This letter is issued at the request of the patient for official purposes. Further medical information will only be released with the patient's explicit written consent, in accordance with applicable confidentiality and privacy laws.

If additional verification is required, please contact our office directly.

Sincerely,

*Georgina Aristotelous, MD*

NPI#1801084660

AIDS Healthcare Foundation, 2829 Euclid Avenue, Cleveland OH 44115

Office: 216.357.3131 Fax: 216.357.3217

Email: Georgina.Aristotelous@ahf.org



**AHF** AIDS HEALTHCARE
FOUNDATION

EXHIBIT 1

----- Forwarded Message -----
**From:** Malgorzata Warchol <mew@mns.com>
**To:** catonsville55@aol.com <catonsville55@aol.com>
**Sent:** Wednesday, April 15, 2026 at 12:42:38 PM EDT
**Subject:** Re: Park Overture #2A

Hi Steven, are you applying with a voucher? Could you provide that if so?
**From:** catonsville55@aol.com <catonsville55@aol.com>
**To:** Malgorzata Warchol <mew@mns.com>
**Cc:** asb@mns.com <asb@mns.com>
**Sent:** Wednesday, April 15, 2026 at 10:04:40 AM EDT
**Subject:** re: Park Overture #2A
Margo,

Thank you for your response. However, under the **NYC Human Rights Law**, a housing provider cannot simply decline a Reasonable Accommodation request because it is 'not something they offer.'

The law requires the landlord/broker to engage in a **Cooperative Dialogue** to find an alternative that meets the applicant's disability-related needs. If a standard 'all-inclusive' lease is not possible, there are alternatives, such as a **Utility Allowance credit** or a **fixed utility surcharge** to satisfy HPD's requirements.

If ownership refuses to engage in this dialogue or provide a Letter of Intent that satisfies my RA, I will be forced to file an emergency complaint with the **NYC Commission on Human Rights** for a **Denial of Reasonable Accommodation**.

I look forward to your immediate proposal for an alternative.

Best,
Steven Williams
(646) 960-4969
On Wednesday, April 15, 2026 at 09:38:36 AM EDT, Malgorzata Warchol <mew@mns.com> wrote:

Good morning Steven,

Unfortunately, adjusting the rent to an "all-inclusive" rent is not something that ownership can offer.

Best,
Margo.

On Thu, Apr 9, 2026 at 7:41 PM catonsville55@aol.com <catonsville55@aol.com> wrote:
Margo,

Thank you for your response. As discussed, I am moving forward with the application for the 1BR unit at 4568 Broadway, Apt 2A (The Park Overture).

Per your request, please find the attached documents to be presented to management **(4560 BWY Partners LLC)**. These documents establish the **Medical Necessity** for this specific location and the requirement for the **Utility Inclusion Rider** to ensure HPD approval of the rent exception.

EXHIBIT 2

Attached Documents:

1. **Doctor's Attestation:** Official medical certification from AHF Healthcare Center regarding proximity to care and housing stability.
2. **Medical Necessity & Transit Summary:** Detailed breakdown of the direct transit link (A-train) and the health-based requirement for this specific building.
3. **Utility Inclusion Rider (Draft):** The proposed lease amendment adjusting the rent to **$3,250 (Utilities Included)** to facilitate the HASA/HPD rent exception.

As this building is subject to **421-a tax incentive regulations**, I am confident that management will understand the necessity of this Reasonable Accommodation under NYC Human Rights Law.

I will be at the **HPD Special Needs/RA Unit (100 Gold Street)** at 9:00 AM tomorrow to coordinate the City's side of this approval. I look forward to receiving the signed **Intent to Rent** form from management so we can finalize this guaranteed-payment lease immediately.

Sincerely,

**Steven Williams**
(646) 960-4969

--
Best Regards,
Malgorzata (Margo) Warhol
Licensed Real Estate Salesperson
c: 347-589-3195
e: mew@mns.com
w: mns.com

From: catonsville55@aol.com <catonsville55@aol.com>
To: asb@mns.com <asb@mns.com>
Cc: sandeliz@mns.com <sandeliz@mns.com>; mew@mns.com <mew@mns.com>
Sent: Wednesday, April 15, 2026 at 09:30:45 AM EDT
Subject: [re park overture unit 2a]

To: Andrew Barrocas (License #10491202297)/Founder & CEO Of MNS Real Estate

Malgorzata Warchol (License #10401375707)/Licensed Real Estate Salesperson,

This letter serves as a formal demand for the **Landlord Letter of Intent to Rent** required for my HPD Request for Reasonable Accommodation. I submitted my application for Apartment 2A in the Park Overture Building, located at 4568 Broadway, New York, NY on April 9, 2026 and paid the required application fee. Since then, you have kept my application "under review" while actively marketing the unit to the public and refusing to provide the necessary HASA/HPD documentation.

Your current conduct constitutes **Source of Income (SOI) Discrimination** under the **New York City Human Rights Law (NYCHRL) § 8-107(5)**. This law applies to all landlords and brokers, regardless of the size of the building or the number of units.

The NYC Commission on Human Rights (CCHR) considers the following 20 actions and omissions to be discriminatory and actionable violations:

1. **Refusal to Provide Necessary Paperwork:** Withholding the Letter of Intent required for a voucher/HPD application.
2. **Procedural Hurdles:** Imposing administrative requirements on me that are not required of "market-rate" tenants.
3. **Intentional Delay:** Keeping an application "under review" indefinitely to wait for a non-voucher applicant.
4. **Active Marketing During Review:** Continuing to advertise the unit as "available" while a voucher applicant has a pending application and has paid fees.
5. **Constructive Denial:** Creating barriers (like missing letters) that make it impossible for the rental to move forward.
6. **Failure to Cooperate with a HASA Client:** Refusal to sign forms required by the HASA/HPD.
7. **Discrimination in Terms and Conditions:** Treating my application differently because of my medical care needs and housing subsidy.
8. **Interference with Reasonable Accommodation:** Blocking a Request for Accommodation for an apartment near medical facilities.
9. **Misrepresentation of Availability:** Implying the unit is still open to others while stalling a current applicant that will use a voucher to guarantee that rent is paid.
10. **Refusal to Accept HASA Vouchers:** Any verbal or written indication that the landlord "does not work with HASA."
11. **Imposing Illegal Credit Standards:** Using credit scores as a pretext to deny an applicant whose rent is fully covered by a subsidy.
12. **Income-to-Rent Ratio Requirements:** Applying "40x rent" rules to a voucher holder, which is a per se violation of SOI law.
13. **Discriminatory Advertising:** Marketing the unit in a way that discourages voucher holders from applying.
14. **Broker Misconduct:** A licensed broker's failure to treat all applicants equally under NYS Real Property Law.
15. **Aiding and Abetting Discrimination:** The broker's participation in a landlord's discriminatory refusal to rent.
16. **Retaliation:** Any adverse action taken against me for asserting my rights under the Human Rights Law.
17. **Refusal to Negotiate:** Failing to engage in the standard rental process once a voucher is disclosed.
18. **Unfair Application Fees:** Retaining an application fee while refusing to process the application in good faith.
19. **Disparate Impact:** Policies that, while seemingly neutral, unfairly exclude individuals with disabilities or low incomes.

20. **Vicarious Liability:** The management company's responsibility for the discriminatory actions of its individual brokers.

The NYC Commission on Human Rights can impose **civil penalties of up to $250,000** for willful violations and award **compensatory damages** to the applicant, including emotional distress and attorney's fees.

Your firm's decision to "review" my application while actively marketing the unit to others— after being informed of my HASA status—is a per se violation of the **NYC Human Rights Law (NYCHRL) § 8-107(5).**

Please be advised that New York courts and the NYC Commission on Human Rights (CCHR) have consistently established that **administrative stalling and refusal to complete paperwork is equivalent to a refusal to rent.** I will be relying on the following precedents in my formal complaints:

1. **NYC Local Law 10 of 2008:** This law established that "lawful source of income" includes any form of federal, state, or local housing assistance, specifically including **HASA/HPD.**
2. **Short v. Manhattan Apartments, Inc. (2012):** This landmark case confirmed that brokers and firms are liable for "steering" voucher holders or creating procedural delays that market-rate tenants do not face.
3. **Timian v. Berman (2018):** Established that a housing provider cannot hide behind "internal approvals" or "third-party reviews" to avoid their legal duty to accept a voucher.
4. **Commission on Human Rights v. JDS (2015):** The Commission ruled that refusing to sign necessary government forms (like a Letter of Intent) constitutes a "constructive denial" of housing based on source of income.
5. **Fair Housing Justice Center v. M.F.M. Associates:** Confirmed that keeping a listing active while stalling a voucher holder is evidence of discriminatory intent.

**DEMAND:** I require the signed **Landlord Letter of Intent to Rent.** Using an "under review" or "waiting to hear from 'Project Manager'" approach is classified as being discriminatory. Owners of real estate brokerage firms are automatically responsible for all activity conducted by their subordinates conducting business using the firm's name, brand, and/or corporate umbrella.

If this letter is not received, I will proceed with the following:

- **A Law Enforcement Bureau Complaint** with the NYC Commission on Human Rights (Requesting Emergency Intervention).
- **A Professional Misconduct Complaint** with the NYS Department of State against the licenses of Andrew Barrocas (#10491202297) and Malgorzata Warchol (#10401375707).

- **Contact with the Manhattan DA's Housing and Tenant Protection Unit** regarding the collection of an application fee for a unit you had no intent to rent in good faith.

I am requesting the **Landlord Letter of Intent to Rent** be delivered to me today. If I do not receive it, I will immediately file an **Emergency Intervention Request** with the NYC Commission on Human Rights and a formal complaint with the NYS Department of State against your professional license.

I hope we can resolve this matter immediately so that I may proceed with my medical accommodation.

Sincerely,

Steven Williams

(646) 960-4969

*CC: NYC Commission on Human Rights (Source of Income Unit)*

On Friday, April 10, 2026 at 07:17:05 PM EDT, catonsville55@aol.com <catonsville55@aol.com> wrote:

Hi Sharline,

Thank you for confirming that you are holding Unit 2A for me.

However, there is a misunderstanding regarding the **Letter of Intent To Rent (LOI)**. The Letter Of Intent To Rent is not a final lease approval; it is the document required by **HPD** to even begin the medical review for the **Reasonable Accommodation.**

By withholding the Letter Of Intent for a 'full review,' you are effectively blocking the City's ability to process the an applicant's medical exception. As the $20 fee and medical documentation have already been provided, there is no further 'review' required to sign a Letter Of Intent To Rent.

Please provide the signed LOI by **10:00 AM tomorrow**. As I stated before, I do have one pre-filled. Considering the fact that I allowed the agent to show the other unit to other prospective tenants that passed up on the unit before I officially applied, this constitutes as a delay of signature, may request the **NYC Commission on Human Rights** to intervene to ensure the 'interactive process' is not being used as a barrier to housing."

Hi Steve,

Thank you for your note, I understand you're looking to move things along as quickly as possible.

I just want to clarify that all applications must be fully reviewed and approved prior to moving

forward with any signatures. Your application is currently under review, and we're working to move it through as quickly as possible.

In the meantime, we are holding the unit for you while this process is completed.

We'll be in touch as soon as we have an update.

Best,
Sharline

On Friday, April 10, 2026 at 07:08:25 PM EDT, Sharline Andeliz <sandeliz@mns.com> wrote:

Hi Steve,

Thank you for your note, I understand you're looking to move things along as quickly as possible.

I just want to clarify that all applications must be fully reviewed and approved prior to moving forward with any signatures. Your application is currently under review, and we're working to move it through as quickly as possible.

In the meantime, we are holding the unit for you while this process is completed.

We'll be in touch as soon as we have an update.

Best,
Sharline

On Fri, Apr 10, 2026 at 6:46 PM catonsville55@aol.com <catonsville55@aol.com> wrote:
Hi Sharline,

Thank you for the update. However, because this application involves a **Reasonable Accommodation (RA)** for a chronic medical condition, 'early next week' is not a viable timeline.

Besides, before I formally applied for the I was courteous enough to allow the agent to show the apartment to other people and they passed on it.

I have already provided the medical documentation and paid the application fee.

Under NYC Human Rights Law, the **interactive process** for an RA must be handled with urgency.

I require the **Letter of Intent To Rent (LOI)** for Unit 2A signed at the **$3,250 (utilities included)** rate that was discussed with the broker by **tomorrow morning** so I can submit the package to HPD for medical approval.

Delaying the signature while the unit remains on the open market (even though the listing isn't supposed to be posted) creates a 'denial of opportunity' for a protected applicant. Please let me know by **10:00 AM tomorrow** if the owner (or project manager, as I was told) is prepared to sign. I have an LOI prepared already.

Steve,
(646) 960-4969

On Friday, April 10, 2026 at 06:27:58 PM EDT, Sharline Andeliz <sandeliz@mns.com> wrote:

Hi Steve,

Your application is being processed. We will get an answer for you early next week.

Sharline Andeliz | **New Development Project Manager**
**o**: 646.532.3228
**f**: 646.896.3700
**w**: mns.com

On Fri, Apr 10, 2026 at 6:05 PM catonsville55@aol.com <catonsville55@aol.com> wrote:
Andrew/Tommy/Sharline/Jordan:

I am the applicant for Unit 2A at The Park Overture.

I've paid the application fee and submitted a medical documentation to MNS, but the brokers are stalling the HPD paperwork.

I am being told that the owner has to give me the final say. And the other broker said it was the Project Managers. So, I want to make sure I am talking to the right person (people). Because of my chronic condition as an applicant, I am more than willing to ensure the owner is aware of this pending civil rights request so it can be signed immediately, as I have already engaged the Commission on Human Rights.
Best,
Steve
(646) 960-4969

--

Sharline Andeliz | **New Development Project Manager**
**o**: 646.532.3228
**f**: 646.896.3700
**w**: mns.com

EXHIBIT 3

**catonsville55@aol.com**
From:catonsville55@aol.com
To:BermanNYSDChambers@nysd.uscourts.gov
Cc:caseopenings@nysd.uscourts.gov
Bcc:ProSe@nysd.uscourts.gov
Thu, Apr 23 at 5:42 PM

*I am copying the Defendants on this thread to ensure the Court that proper notice of this emergency application has been provided in accordance with the rules against ex parte communication.*

**To:** prose@nysd.uscourts.gov <prose@nysd.uscourts.gov>
**Cc:** Andrew Barrocas <asb@mns.com>; Malgorzata Warchol <mew@mns.com>; Sharline Andeliz <sandeliz@mns.com>; mbaron@baronprop.com <mbaron@baronprop.com>; mporcelli@largavista.com <mporcelli@largavista.com>; mporcelli@largavista.net <mporcelli@largavista.net>
**Sent:** Thursday, April 23, 2026 at 05:33:23 PM EDT
**Subject:** URGENT: MANDATORY EMERGENCY ASSIGNMENT REQ. - Case 1:26-cv-03204 - EFR COMPLIANCE

*I am copying the Defendants on this thread to ensure the Court that proper notice of this emergency application has been provided in accordance with the rules against ex parte communication.*

**To the Clerk of Court and the Case Openings Department:**

RE: MANDATORY EXPEDITED ASSIGNMENT UNDER EFR RULES - CASE NO: 1:26-cv-03204

I am the Plaintiff pro se. My In Forma Pauperis (IFP) application was granted on April 22, 2026. This case remains unassigned (UA) despite being an active emergency.

Pursuant to the Electronic Filing Rules (EFR) and the SDNY's procedures for emergency applications, the Clerk's Office is required to expedite the processing

and assignment of matters involving a Temporary Restraining Order (TRO) to prevent irreparable harm.

The emergency is as follows: The subject property is a 421-a rent-stabilized unit (4568 Broadway, Unit 2A) that is currently being marketed to third parties. Without the immediate assignment of a Judge to review my TRO, my claims under the Fair Housing Act will be rendered moot and I will face immediate, permanent homelessness.

Under the EFR protocols for emergency filings, I respectfully demand that this case be immediately routed to the Part I Emergency Judge or assigned to a District Judge via the electronic wheel without further administrative delay. The "unassigned" status of a live emergency filing constitutes a denial of access to the Court.

I am available for an emergency hearing immediately.

Respectfully,

Steven Williams

Plaintiff Pro Se

(646) 960-4969

(CC): The defendants named in this case have been forwarded a copy of the email that I am sending. They are now aware that I am requesting a judge for this active case at this moment.

NYC HPD OPEN VIOLATIONS · METRODEEDS.COM · UPDATED DAILY

*EXHIBIT 4*

← NYC Landlord Ripoff Watch

OPERATOR PROFILE · NYC LANDLORD RIPOFF WATCH

# HARRY HIRSCH

**98/100**   DISTRESS SCORE

🔨 **Serial Evictor**      🔧 **Chronic Heat Violator**      ☁ **Mold Cluster**      🔒 **Vacate Order History**

🐀 **Pest Infestation**      🏠 **Rent Stabilized**      ⚠ **AEP Building (1 active)**      🔍 **HPD Spec Watch**

🕳 **Shell Cluster**

---

⚑ **HPD ALTERNATIVE ENFORCEMENT PROGRAM**

This operator has buildings under HPD's Alternative Enforcement Program (AEP) — a citywide list of the most distressed properties with persistent hazardous conditions. AEP buildings are subject to emergency repairs, fee assessments, and possible receivership if violations remain unaddressed.

---

Open in MetroDeeds →

---

**TOTAL PROPERTIES**

## 381

in MN, BX, BK, QN

---

**TOTAL OPEN VIOLATIONS**

## 8,793

HPD open records

---

**CLASS C — IMMEDIATELY HAZARDOUS**

## 2,338

Case 1:26-cv-03204-MKV    Document 19    Filed 05/11/26    Page 34 of 46

27% of all violations

## BOROUGHS ACTIVE

# MN · BX · BK · QN

multi-borough operator

## RENT STABILIZED UNITS

# 635

across 10 buildings

## EST. MARKET VALUE

# $50.5M

PLUTO fullval sum

## MANAGED BY

# HARRY HIRSCH

most frequent HPD agent

## CRIME NEARBY

# 175

Felonies · 457 total incidents

within 0.25mi · last 12mo

Top Infractions: Petty Theft · Grand Larceny · Harassment

HARRY HIRSCH is associated with a portfolio of 381 NYC residential buildings registered through the NYC Department of Housing Preservation and Development's landlord-registration system, spanning Manhattan, the Bronx, Brooklyn, and Queens. NYC public records show 8,793 open HPD housing-maintenance code violations across these buildings, including 2,338 Class C (immediately hazardous, the most serious classification) and 4,800 Class B (hazardous) — placing this portfolio at distress score 98, the maximum on the MetroDeeds Landlord Ripoff Watch. MetroDeeds flags this portfolio for serial-evictor designation (top 5% of NYC operators by eviction execution rate), vacate-order history, and AEP (Alternative Enforcement Program) enrollment. The most recent confirmed deed transfer to this portfolio was recorded by NYC ACRIS on November 16, 2022 for 4560 BROADWAY. All data sourced from NYC HPD violation feeds, ACRIS deed records via the NYC Department of Finance, and the NYC Public Advocate's annual Worst Landlord watchlist. See the methodology page for scoring details.

## ⌂ RENT-STABILIZED BUILDINGS

10 buildings · 635 estimated rent-stabilized units

| ADDRESS | CLASS | YEAR BUILT | RS UNITS |
|---|---|---|---|
| 3 HANOVER SQUARE | D0 | 1926 | 202 |
| 371 WEST STREET | C6 | 1960 | 184 |
| 720 WEST 11 STREET | C6 | 1939 | 100 |
| 465 WEST 46 STREET | C6 | 1900 | 50 |
| 28 WEST 38 STREET | D0 | 1910 | 22 |

Show all 10 →

## MANAGEMENT CONTACTS

| MANAGING AGENT | REGISTERED OWNER | TOTAL NAMED CONTACTS |
|---|---|---|
| **AKAM ASSOCIATES, INC.** | **WVH HOUSING CORPORATION** | **10** |
| 223 buildings | CorporateOwner · 40 buildings | across HPD registrations |

Case 1:26-cv-03204-MKV    Document 19    Filed 05/11/26    Page 36 of 46

## Recent Acquisitions

LAST 5 DEEDS RECORDED AT ACRIS FOR PROPERTIES ASSOCIATED WITH THIS OPERATOR

| DATE | ADDRESS | PRICE PAID | SELLER | DOC TYPE |
|---|---|---|---|---|
| Mar 16, 2026 | **537 3 AVENUE** | $385K | GRAHAM, JEAN ELYSE | RPTT&RET |
| Mar 25, 2026 | **25 TUDOR CITY PLACE** | $305K | ALBERTI, ELVIRA | RPTT&RET |
| Feb 12, 2026 | **333 EAST 57 STREET** | Not disclosed | TD BANK N.A. | ASST |

Show all 5 →

## Violation Breakdown

8,793 TOTAL OPEN HPD VIOLATIONS

**Class C — Immediately Hazardous**                                   **2,338 (27%)**

Class B — Hazardous                                                   4,800 (55%)

**Class A — Non-Hazardous**                                          **1,655 (19%)**

⚠ Class C violations are immediately hazardous to tenants — including lead paint, mold, lack of heat, and structural defects.

## 📞 311 Complaint Activity

ALL HPD-ROUTED 311 COMPLAINTS ACROSS THIS PORTFOLIO

TOTAL COMPLAINTS (ALL-TIME)

# 3,751

HPD-routed 311 complaints

Case 1:26-cv-03204-MKV          Document 19      Filed 05/11/26      Page 37 of 46

**LAST 12 MONTHS**

# 804

complaints filed

**TOP CATEGORY**

# HEAT/HOT WATER

most common type

## COMPLAINT VOLUME BY TYPE (ALL-TIME)

| | |
|---|---:|
| HEAT/HOT WATER | 1,776 |
| UNSANITARY CONDITION | 695 |
| PAINT/PLASTER | 452 |
| PLUMBING | 331 |
| WATER LEAK | 255 |
| DOOR/WINDOW | 237 |
| ELEVATOR | 5 |

## YEAR-OVER-YEAR ACTIVITY

| | 984 | | | | |
|---|---|---|---|---|---|
| | | 595 | 641 | 678 | |
| 444 | | | | | 409 |
| 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |

Source: NYC 311 Service Requests (erm2-nwe9) · HPD-routed housing complaints · Updated daily

## ⚖️ Marshal Eviction Filings

NYC MARSHAL EXECUTED EVICTIONS FROM OPEN DATA · RESIDENTIAL UNITS

| ALL-TIME EVICTIONS | LAST 3 YEARS | LAST 12 MONTHS |
|---|---|---|
| **91** | **47** | **11** |
| executed by NYC marshal | executed evictions | executed evictions |

▸ ▸ TOP 5 PROPERTIES BY EVICTION COUNT (LAST 3 YRS)

Source: NYC Open Data dataset 6z8x-wfk4 (Marshal Evictions) · Updated daily

# 🏛 Housing Court Filings

NYC HPD HOUSING LITIGATION DIVISION · DATASET r8na-hjbv

| TOTAL CASES | OPEN CASES | HP ACTIONS | 7A CASES |
|---|---|---|---|
| **257** | **9** | **182** | **1** |
| all-time filings | active proceedings | tenant actions filed for repairs | court-appointed administrator |

⚠ 1 7A proceeding(s) on record — a court has appointed or considered appointing an administrator to manage this operator's buildings due to severe neglect.

▸ ▸ CASE TYPE BREAKDOWN (8 TYPES)

| CASE TYPE | FILED | STATUS | BBL |
|---|---|---|---|
| Tenant Action | Mar 2, 2026 | PENDING | 2024590034 |
| Tenant Action | Feb 16, 2026 | PENDING | 1001170001 |
| Tenant Action | Jan 20, 2026 | PENDING | 1012350007 |
| Tenant Action/Harrassment | Dec 22, 2025 | PENDING | 2024590034 |
| Tenant Action | Dec 21, 2025 | PENDING | 1000337501 |

Show all 10 →

Source: NYC HPD Housing Litigation Division · dataset r8na-hjbv · Updated regularly via NYC Open Data

## 📞 311 Housing Complaints

HPD-ROUTED 311 COMPLAINTS FILED AGAINST PROPERTIES IN THIS PORTFOLIO

| HEAT / HOT WATER (12MO) | ELEVATOR (24MO) | MOLD (24MO) |
|---|---|---|
| **445** | **1** | **0** |
| complaints filed | complaints filed | complaints filed |

▶ ▸ TOP 5 PROPERTIES BY HEAT COMPLAINTS (12mo)

⚠ Heat complaints exceed the citywide p90 threshold (19/BBL/12mo) — this operator is among the worst heat complaint recipients in NYC.

Source: NYC 311 Service Requests (erm2-nwe9) · Housing complaint types only · Updated daily

## 🏗 DOB Building Permits

DOB NOW: BUILD JOB APPLICATION FILINGS · DATASET w9ak-ipjd · 2016–PRESENT

| TOTAL PERMITS FILED | UNIT REDUCTION FILINGS |
|---|---|
| **5,476** | **96** |
| all filings on record | proposed < existing dwelling units |

⚠ 96 permit(s) filed proposing fewer dwelling units than currently exist — a common mechanism for deregulating rent-stabilized apartments and displacing tenants.

| ADDRESS | JOB TYPE | FILED | STATUS | UNITS Δ | APPLICANT |
|---|---|---|---|---|---|
| 29 EAST 22 STREET | Alteration | Apr 2, 2026 | Pending Plan Examiner Assignment | — | JACK GREEN |
| 180 WEST END AVENUE | Alteration | Apr 1, 2026 | Plan Examiner Review | — | Carlos Honorio, Jr. |

| ADDRESS | JOB TYPE | FILED | STATUS | UNITS Δ | APPLICANT |
|---|---|---|---|---|---|
| 347 WEST 57 STREET | Alteration | Apr 1, 2026 | Prof Cert QA Review | — | Shahrish Shuvo |
| 761 7 AVENUE | Alteration | Apr 1, 2026 | Approved | — | Roger Tan |
| 280 RECTOR PLACE | Alteration | Apr 1, 2026 | Pending Plan Examiner Assignment | — | PAWEL SABAT |

Show all 10 →

Source: NYC DOB NOW: Build – Job Application Filings · dataset w9ak-ipjd · 2016–present

##  DOB Violations

NYC DEPARTMENT OF BUILDINGS VIOLATIONS ACROSS THIS PORTFOLIO

**TOTAL DOB VIOLATIONS**

# 8,481

all-time on record

**ACTIVE VIOLATIONS**

# 496

currently open

▶ ▸ TOP 5 PROPERTIES BY DOB VIOLATION COUNT

Source: NYC Open Data dataset 3h2n-5cm9 (DOB Violations) · Updated periodically

##  Lead Paint Violations

HPD LEAD PAINT VIOLATIONS ACROSS THIS PORTFOLIO · DATASET au8t-hgv2

**TOTAL VIOLATIONS**

# 8

all-time on record

**OPEN VIOLATIONS**

# 2

not yet certified closed

**CLASS C (HAZARDOUS)**

# 8

immediately hazardous lead conditions

⚠ 2 open lead paint violation(s) — children under 6 and pregnant women face serious health risks from lead exposure. HPD requires certified correction.

▶ ▸ **TOP 4 PROPERTIES BY LEAD VIOLATION COUNT**

Source: NYC HPD Lead Paint Violations · dataset au8t-hgv2 · Updated periodically

## Full Property Portfolio

381 PROPERTIES REGISTERED UNDER THIS OPERATOR WITH NYC HPD

Export CSV ↓

| ADDRESS | BOROUGH | UNITS | BUILT | ASSESSED | OPEN VIOLATIONS | VIEW |
|---|---|---|---|---|---|---|
| 21-05 33 STREET | QN | 621 | 1923 | $20.8M | 1,772 | View → |
| 888 GRAND CONCOURSE | BX | 91 | 1937 | $4.1M | 1,246 | View → |
| 411 AUDUBON AVENUE | MN | 25 | 1915 | $605K | 545 | View → |
| 686 ACADEMY STREET | MN | 30 | 1930 | $810K | 523 | View → |
| 674 ACADEMY STREET | MN | 31 | 1930 | $981K | 517 | View → |
| 32 MACOMBS PLACE | MN | 24 | 1920 | $781K | 287 | View → |
| 3207 OXFORD AVENUE | BX | 12 | 1985 | $446K | 284 | View → |
| 333 WEST 56 STREET | MN | 597 | 1904 | $89.0M | 251 | View → |
| 530 GRAND STREET | MN | 533 | 1949 | $31.6M | 192 | View → |
| 664 10 AVENUE | MN | 61 | 1900 | $6.4M | 175 | View → |

Show all 200 →

##  Shell Company Cluster Detected

REGISTERED AGENT ADDRESS FLAGS THIS OPERATOR AS A POTENTIAL SHELL CLUSTER

**REGISTERED AGENT ADDRESS**

## 270 MADISON AVENUE

| TOTAL ENTITIES AT ADDRESS | RESIDENTIAL LLCS / CORPS | CONCENTRATION RATIO |
|---|---|---|
| 180 | 132 | 73% |

SHELL SCORE

96.80

⚠ 132 LLCs registered at this address — 73% are NYC residential entities. A high concentration of residential LLCs registered at a single agent address is a common indicator of shell company structuring used to obscure property ownership.

## Unlock the full portfolio for HARRY HIRSCH

Full portfolio grid with PLUTO building data, violation counts, and borough breakdown — **Scout+ $49.99/mo.**

Add complete deed history with buyer and seller names, sale prices, and same-day EDS alerts — **Pro $149.99/mo.**

View Full Portfolio →

## Frequently asked questions about HARRY HIRSCH

**How many NYC properties does HARRY HIRSCH own?**

**How many HPD violations does HARRY HIRSCH's portfolio have?**

**Is HARRY HIRSCH on the NYC Public Advocate's Worst Landlord list?**

**What's HARRY HIRSCH's eviction filing rate?**

## When was HARRY HIRSCH's most recent property acquisition?

Data sourced from NYC Open Data, NYC HPD, NYC ACRIS, and NYC DOF. All rankings, scores, and data are algorithmic and for informational purposes only — they do not constitute legal findings or accusations of wrongdoing. Data may be incomplete or delayed. MetroDeeds is not affiliated with any government agency. Verify through official sources before making legal, financial, or housing decisions. Terms · Privacy · hello@metrodeeds.com

# Rental Application for **4560 BWY Partners, LLC**

APPLICATION FOR RENTAL

Notice: All adult applicants (18 years or older) must complete a separate application for rental.

## APPLICANT INFORMATION

| LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Williams | Steven | Alan | |

| SSN | BIRTH DATE | PHONE - TYPE | |
|---|---|---|---|
| ***-**-**** | 8/29/1984 | (646) 960 - 4969 - Mobile | |

| EMAIL | ARE YOU A SERVICE MEMBER? |
|---|---|
| catonsville55@aol.com | NO |

### CURRENT ADDRESS

| STREET ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 316 West 97th Street | New York | NY | 10025 |

| MOVE IN DATE | MOVE OUT DATE | MONTHLY RENT |
|---|---|---|
| 3/27/2026 | current | $1.00 / Mo. |

**REASON FOR LEAVING**

Applicant is a HASA client with a history of chronic homelessness. Residential history is documented and verified by the NYC Department of Homeless Services (DHS) and HRA. System requires a value >$0; actual rent is $0 as I am currently in a NYC Emergency SRO. My housing is fully subsidized by HASA/HPD.

### PREVIOUS ADDRESS

| STREET ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|
| 400 8th Avenue | New York | NY | 10001 |

| MOVE IN DATE | MOVE OUT DATE | MONTHLY RENT |
|---|---|---|
| 3/27/2023 | 3/27/2026 | $1.00 / Mo. |

### EMPLOYMENT & INCOME INFORMATION

| OTHER INCOME DESCRIPTION | MONTHLY INCOME |
|---|---|
| NYC HASA Housing Subsidy | $39,000.00/Yr. |

### NEW YORK CITY TENANT FAIR CHANCE ACT

Pursuant to the laws of the federal government, New York State, and NYC Admin. Code § 20-807 et seq., we are required to provide you with the following disclosure:

1) The application information you provide will be used by this community's owner or designated agent (the "Owner") to obtain a tenant screening report on you, and the Owner may use this report to determine your suitability for housing.

2) If your application is denied or other adverse action is taken against you on the basis of information contained in the tenant screening report, the Owner must tell you that such action was taken and provide you with the contact information of the screening company that provided the tenant screening report.

3) You may obtain a free copy of the report and dispute inaccurate or incorrect information on the report directly with the screening company at: Attn: On-Site c/o RealPage, 2201 Lakeside Boulevard, Richardson, TX 75082; 1-877-222-0384; www.on-site.com/renter-relations/.

4) You are entitled to one free tenant screening report from each national consumer reporting agency annually, in addition to a credit report which can be obtained from www.annualcreditreport.com.

### ACKNOWLEDGEMENTS

☒ I have been provided with the Fair Chance Act disclosure, pursuant to the laws of the federal government, New York State, and NYC Admin. Code § 20-807 et seq.





1

## APPLICATION CONSENT

I hereby warrant that all statements set forth above are true.

I understand that a consumer report and/or an investigative consumer report may be requested in connection with my prospective or continuing housing or guarantor application with **4560 BWY Partners, LLC** through RP On-Site LLC (On-Site). I understand that these reports may include information concerning my character, employment and income verification, general reputation, personal characteristics, public records information, criminal records information, education, qualifications, motor vehicle record, mode of living, credit and indebtedness information, and any other information which may reflect upon my potential for tenancy or guarantor status gathered from any individual, organization, entity, agency, or other source which may have knowledge concerning any such items of information.

I understand that **4560 BWY Partners, LLC** may require income and employment verification in connection with my application. I further understand that income and employment verification require access to my employment, income, and payroll related information. I authorize and consent to the access to, use, and release of such information by On-Site, Trans Union LLC, and other applicable credit bureaus for the purpose of providing the verification services in relation to my application and during the course of any ongoing lease obligation arising from such application.

I understand that if an investigative consumer report is requested about me, I have the right to make a written request to **4560 BWY Partners, LLC**, within a reasonable period of time, for complete and accurate disclosure of the nature and scope of the investigation requested.

I consent to the delivery of all notices or disclosures required by law via any medium so chosen by **4560 BWY Partners, LLC** or On-Site, including but not limited to email or other electronic transmission. I understand that all notices shall be deemed received upon being sent.

By submitting this application, I certify that I have read and fully understand the disclosures and my rights detailed above and authorize On-Site to obtain, for the purpose of determining my eligibility for initial or continued tenancy or guarantor status, a consumer report and/or investigative consumer report and to disclose all information obtained by On-Site to **4560 BWY Partners, LLC**, its affiliates, and assigns now and in the future. I also certify that I have read and fully understand my rights under the FCRA available at https://www.on-site.com/resources/consent/fcraDisclosuresConsent.pdf.

I understand that, upon written request, I will be informed whether or not a consumer report or an investigative consumer report was requested and, if such a report was requested, informed of the name and address of the credit reporting agency that furnished the report. With regard to "investigative consumer reports", I further understand that when I receive the name and address of the consumer reporting agency, I may request a copy of such report by contacting such agency. I acknowledge that I have received and read Article 23-A of the New York Correction Law (https://www.on-site.com/resources/consent/correctionLawArticle23a.pdf)

4/9/2026
07:59 PM EDT

Steven Alan Williams *(Applicant)*                                    Date



2

*Give To Applicant*

# RECEIPT FOR APPLICATION FEE

| Applicant: | Applicant Address: | Date: |
|---|---|---|
| Steven Alan Williams | 316 West 97th Street, New York, NY 10025 | April 9, 2026 |
| **Requested By:** | **Apartment Address:** | |
| 4560 BWY PARTNERS, LLC | - | |

| Application Fee - Description | Amount |
|---|---|
| Application fee for Steven Alan Williams | $20.00 |
| Payment - Thank You | - $20.00 |
| Total Due Applicant: | $0.00 |

The following charge(s) will appear on your card statement as *"ClickPay"*

**Application Fee - Charge Details**

| Name on Card | Account Number | Reference Number | Authorized |
|---|---|---|---|
| Steven Williams | XXXXXXXXXXXX5144 | 16565317 | $20.00 |

*This card has been authorized for the amount above and will be charged when the application is processed.*

| Itemized Property Expenses | Amount |
|---|---|
| On-Site Identity Verification for Steven Alan Williams | $3.68 |
| Administrative Costs for Steven Alan Williams | $16.32 |
| Total Property Expenses: | $20.00 |

1